UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

-----------------------------------------------------------X

In re:

Chapter 11

SPEYSIDE HOLDINGS LLC
*d/b/a* SPEYSIDE SAND & STONE,
SPEYSIDE HOLDINGS II LLC,
CEM III LLC,
SGD GROUP HOLDINGS II LLC,
SGD GROUP HOLDINGS III LLC,
SRG HORSEBLOCK II LLC, and
SRG HORSEBLOCK IV LLC,

Case No. 26-70730-spg

(Jointly Administered)

                    Debtors.

-----------------------------------------------------------X

## <u>MEMORANDUM DECISION</u>

**Appearances:**

BFSNG LAW GROUP, LLP
*Counsel to the Debtors and*
*Debtors-in-Possession*
6851 Jericho Turnpike, Suite 250
Syosset, New York 11791
By:    Gary C. Fischoff, Esq.

THE LAW OFFICES OF
ROBERT DEL COL, ESQ.
*Special Counsel to the Debtors and*
*Debtors-in-Possession*
550 Route 111
Hauppauge, New York 11787
By:    Robert Del Col, Esq.

SQUIRE PATTON BOGGS (US) LLP
*Counsel to SpeyLo Holdings, LLC*
1120 Avenue of the Americas, 13th Floor
New York, New York 10036
By:    Katherine R. Catanese, Esq.

SQUIRE PATTON BOGGS (US) LLP
*Counsel to SpeyLo Holdings, LLC*
2550 M Street, N.W.
Washington, D.C. 20037
By:    Christopher Giaimo, Esq.

WESTERMAN BALL EDERER MILLER
ZUCKER & SHARFSTEIN, LLP
*Counsel to Greg S. Zucker, Esq., Receiver*
1201 RXR Plaza
Uniondale, New York 11556
By:    Thomas A. Draghi, Esq.

BARCLAY DAMON LLP
*Counsel to Amalgamated*
*Suncoast Portfolio, LLC*
555 Long Wharf Drive, Sixth Floor
New Haven, Connecticut 06511
By:    Ilan Markus, Esq.

WILLIAM K. HARRINGTON,
UNITED STATES TRUSTEE FOR REGION 2
*Office of the United States Trustee*
Alfonse M. D'Amato Federal Courthouse
560 Federal Plaza, Room 560
Central Islip, New York 11722
By:    Christine H. Black, Esq.

**TABLE OF CONTENTS**

I.     INTRODUCTION………………………………………………………………….......1

II.    SELECTED BACKGROUND………………………………………………………….2

III.   DISCUSSION……………………………………………………….…….…………7

       A.    The Admissibility of the Receiver Reports Prepared by Howard Cohen………..7

       B.    The Motion *in Limine*…………………………………………………………9

       C.    The Chapter 11 Trustee Motion……………….....................................................11

             1.    *Speylo Is a Party in Interest with Standing, and the Court Is Barred by
                   the* Rooker-Feldman *Doctrine from Deciding
                   Otherwise*…………………………………………………………..11

             2.    *Bankruptcy Code § 1104*…………………………………………......…14

                   a.    Bankruptcy Code § 1104(a)(1)……………….……….……..........15

                   b.    Bankruptcy Code § 1104(a)(2)…………………………..…..…...19

                         i.     *Trustworthiness of the Debtors*……………….…..…..….20

                         ii.    *The Debtors' past and present performance
                                and prospects for reorganization*………………….…..21

                         iii.   *Confidence of creditors*……………………………..….23

                         iv.    *Benefits of appointing a trustee versus costs*………..…...23

       D.    Excusing the Receiver from Compliance with Bankruptcy Code § 543………...24

IV.    CONCLUSION……………………………………………………….…………….…..27

**THE HONORABLE SHERYL P. GIUGLIANO**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Before the Court are a series of motions in the jointly administered chapter 11 cases of debtors (collectively, the "Debtors"): Speyside Holdings LLC *d/b/a* Speyside Sand & Stone ("Speyside Holdings"); Speyside Holdings II LLC; CEM III LLC; SGD Group Holdings II LLC; SGD Group Holdings III LLC; SRG Horseblock II LLC; and SRG Horseblock IV LLC.  The main motion [ECF No. 25] (the "Chapter 11 Trustee Motion") is by SpeyLo Holdings, LLC ("SpeyLo"), the Debtors' secured lender, seeking entry of an order: (i) appointing a chapter 11 trustee for the Debtors' cases pursuant to section 1104(a) of title 11, United States Code (the "Bankruptcy Code"); and (ii) otherwise excusing Gregory S. Zucker, in his capacity as receiver appointed in a state court foreclosure proceeding, from turning over property to the Debtors pursuant to Bankruptcy Code § 543(d). Creditor Amalgamated Suncoast Portfolio, LLC filed a statement in support of the Chapter 11 Trustee Motion [ECF No. 57]. The Debtors opposed the Chapter 11 Trustee Motion [ECF No. 43].  In addition to the contested Chapter 11 Trustee Motion: (i) SpeyLo filed a motion *in limine* [ECF No. 47] (the "Motion *in Limine*") seeking to exclude certain evidence and argument from the hearing on the Chapter 11 Trustee Motion; and (ii) a discovery dispute arose during the hearing on the Chapter 11 Trustee Motion over the admissibility of certain letters filed in the state court foreclosure proceeding by Mr. Zucker's predecessor, the original receiver [SpeyLo Ex. C], which SpeyLo sought to include in the record. Hearings on these matters took place on March 11, 12, 16, 23, 24 and 26, 2026 (collectively, the "Hearings").

Upon careful review of the record and thoughtful consideration of the arguments raised by the parties, the Court finds that, for the reasons to be set forth, the Chapter 11 Trustee Motion is **DENIED** without prejudice, and the Motion *in Limine* is **DENIED** as moot. Last, Speylo's

1

Exhibit C, which consists of letter reports to the state court from the original receiver, is admissible under the business records exception to hearsay pursuant to rule 803(6) of the Federal Rules of Evidence (the "Evidence Rules").

## II.     SELECTED BACKGROUND

Speyside Holdings, Speyside Holdings II LLC, and CEM III LLC cumulatively own approximately 199 acres in Highland Mills, New York (the "Quarry"), on which Speyside Holdings operates a stone quarry. In February 2020, Speyside Holdings borrowed approximately $14 million (the "Loan") from Nebari National Resources Credit Fund L.P. ("Nebari")[1], Speylo's predecessor in interest. The documents to the transaction are: the Loan Agreement, effective as of February 25, 2020, between Nebari and the Debtors (the "Loan Agreement") [SpeyLo Ex. L]; the Mortgage, Consolidation, Extension and Modification Agreement (the "Mortgage"), dated February 10, 2020, and the amendments thereto [SpeyLo Ex. K]; and the Consolidated, Restated and Amended Promissory Note ("Note"), dated March 6, 2020 [SpeyLo Ex. K]. The Loan is secured by a first mortgage lien on the Quarry. As additional collateral for the Loan: (i) Eugene Fernandez, a principal of the Debtors, personally guaranteed the Loan; and (ii) SGD Group Holdings II LLC, SGD Group Holdings III LLC, SRG Horseblock II LLC, and SRG Horseblock IV LLC granted second mortgage liens on several parcels of vacant land located in Yaphank, New York (the "Yaphank Properties," and together with the Quarry, the "Properties"). Nebari was also granted a lien on the Debtors' assets [*see* Speylo Ex. L].

In September 2021, upon the occurrence of an alleged monetary default under the Loan Agreement, Nebari commenced a foreclosure action (the "Foreclosure Action") in New York State Supreme Court, Suffolk County (the "State Court") [*see* SpeyLo Ex. A]. On April 7, 2022, Nebari

---

[1] The Court shall sometimes refer to Nebari and Speylo as the "Lender".

assigned its interest in the Loan to SpeyLo pursuant to an Assignment and Assumption Agreement (the "Assignment Agreement") [Debtors' Ex. 2]. The Assignment Agreement assigns the Loan from Nebari to SpeyLo, effective April 7, 2022, and includes an assignment of "all of [Nebari's] rights and obligations in its capacity as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto." [*Id.*].

On May 3, 2023, the State Court entered an order (the "First Receiver Order") granting Nebari's motion to appoint a receiver (the "Receiver") to oversee the Quarry business, naming Howard Cohen as the Receiver [*see* SpeyLo Ex. A]. Mr. Cohen stepped down from this role, but as of the Petition Date a Receiver was still in place. In the First Receiver Order, Mr. Cohen was authorized to continue, manage and operate the Properties. The First Receiver Order also directed that the Debtors remain on the Properties, continue to manage and operate the Properties, and only be removed by further order of the State Court or by agreement. The State Court also authorized the Receiver to retain counsel and a property manager, as well as payment to the Receiver. Paragraph 16 of the First Receiver Order directed the Receiver to provide the State Court with reports ("Receivership Reports") with respect to significant events concerning and which might affect the value of the Properties. In compliance with this directive, the Receiver filed several Receivership Reports. By order dated June 21, 2023, the Receiver was authorized by the State Court to retain Greg Harris as property manager (the "Property Manager") for the Properties [*see* SpeyLo Ex. D]. The Receiver was to be paid $275.00 per hour, with payment not to exceed "4% of the sum revenue from the [o]peration of the [Properties]" plus reimbursement of reasonable out of pocket expenses, with payment to be made "out of net cash flow of the [r]eceivership upon further order of the Court." [SpeyLo Ex. A]. Pursuant to the First Receiver Order, if the net cash flow from operations of the Properties was insufficient to pay the Receiver, the Receiver was

directed to collect payment from the lender, listed as Nebari. On March 12, 2024, the State Court entered an order (the "Second Receiver Order")[2] granting a motion expanding the Receiver's powers to include: (1) legally binding and entering into contracts on behalf of Speyside Holdings; (2) notifying and communicating with Speyside Holdings's vendors, creditors and account debtors; and (3) discharging and removing Speyside Holdings personnel [SpeyLo Ex. B]. The additional receivership powers were granted in response to Mr. Fernandez engaging in transactions to purchase equipment and enter into leases without authorization from the Receiver, negotiating to sell over 250,000 tons of sand and gravel without first sharing the contract and its terms with the Receiver or obtaining authorization from the Receiver, and negotiating equipment leases without discussing with or obtaining authorization from the Receiver [*Id.*]. On August 30, 2024, Mr. Cohen was replaced by Mr. Zucker as the Receiver. [SpeyLo Ex. A]. On October 22, 2025, a Second Amended Judgment of Foreclosure and Sale (the "Judgment of Foreclosure") was entered in the Foreclosure Action [SpeyLo Ex. O]. On February 20, 2026, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code commencing the instant cases.

Although the parties in these cases agree that Quarry operations have underperformed over the past five (5) years during the pendency of the Foreclosure Action, the parties disagree with respect to the reasons.

First, the Debtors assert that the COVID pandemic decreased sales by at least fifty (50%) percent. [*see* 03/26/2026 Trial Tr., p. 45]. Second, the Debtors pinpoint December 2020, which is the time that the Lender activated a Deposit Account Control Agreement (the "DACA") after the Debtors defaulted under the Loan Agreement and swept all cash from the Debtors' bank accounts

---

[2] The First Receivership Order and the Second Receivership Order shall be collectively referred to herein as the "Receivership Orders".

4

[03/26/2026 Trial Tr., pp. 57−58]. The Debtors claim that since then, they have had no independent control over the Quarry's operations, and every financial transaction has required approval from the Lender [*see* 03/26/2026 Trial Tr., pp. 58−60]. Indeed, pursuant to the terms of the First Receiver Order, every expenditure in excess of $5,000.00 required approval either from the Lender or by the State Court [*see* SpeyLo Ex. A; 03/16/2026 Trial Tr., pp. 60−61]. Likewise, many suggestions made by Mr. Fernandez to improve operations at the Quarry, such as purchasing certain equipment instead of renting, were rejected by the Receiver [*see* 03/16/2026 Trial Tr., pp. 60−61].

Third, the Debtors cite to a possible sale of the Yaphank Properties which was allegedly thwarted by Nebari. In March 2020, before the Receiver was appointed, the Debtors sought to monetize the value of the Yaphank Properties by entering a contract of sale with Scannell Properties ("Scannell") [*see* Debtors' Ex. 22]. The Lender placed a *lis pendens* on the Yaphank Properties and sought to void the contract of sale with Scannell as violative of section 6.31 of the Loan Agreement [Debtors' Ex. 23]. Scannell ceased due diligence and the potential sale collapsed.

Fourth, the Debtors point to problems with contractors hired to extract and crush the rock from the Quarry, such as J.R. Vinagro Corporation ("Vinagro"). Vinagro was a third party company that had its own equipment to crush rock [*see* 03/26/2026 Trial Tr., p. 26]. According to Mr. Fernandez's testimony, the Lender wanted the Debtors to hire Vinagro when some of the Debtors' equipment was retooled, while the Debtors believed it would have been more cost effective to use a portion of the Debtors' crushing equipment which produced higher quality crushed rock [*see* 03/26/2026 Trial Tr., p. 37]. The Debtors pointed to issues with Sandvik SRP AB ("Sandvik"), hired to provide some of the equipment to crush the rock from the Quarry. Mr. Zucker testified that there were "tremendous" problems with the equipment provided by Sandvik, and some of it

was not operational [*see* 03/16/2026 Trial Tr., p. 43]. The problems with the Sandvik equipment adversely affected the production levels at the Quarry [*see* 03/16/2026 Trial Tr., pp. 68−69].

Finally, the Debtors blame their inability to turn a profit on the financial burden imposed from the fees awarded and paid to the Receiver and Property Manager in the aggregate amount of approximately $800,000.00 [*see* 03/16/2026 Trial Tr., p. 54]. While the fees were duly awarded by the State Court, and this Court is not questioning the State Court's orders awarding these fees, they have adversely affected the Debtors' cash flow.

The Lender's story differs substantially. By way of example, first, the Lender disputes that the Receiver was "in control" of Quarry operations. Instead, the Lender asserts that Debtors' management unilaterally made significant financial decisions in direct opposition to State Court orders, including the Receivership Orders. Second, the Lender highlights the Debtors' failure to provide a "mining plan" for the life of the Quarry, or a "business plan" to improve profitability and efficiency [*see* 03/23/2026 Trial Tr., p. 27]. According to Nate Moore, the Lender's expert witness in mining operations, the absence of those essential plans may cause serious issues for future mining operations [*see id.*]. Third, the Lender points to the Debtors' failure to obtain a permit to mine the south portion of the Quarry [*see* 03/23/2026 Trial Tr., pp. 27, 31]. Again, these are only some examples of the Lender's issues with the Debtors' management and operations.

The record reflects that the parties agree that: (1) additional capital is needed to repair and/or replace worn out and broken machinery at the Quarry [*see* 03/23/2026 Trial Tr., pp. 24, 25, 36]; and (2) a sale of the Debtor's assets is the best exit strategy [*see* 03/23/2026 Trial Tr., p. 9].

### III.  **DISCUSSION**

**A.  The Admissibility of the Receiver Reports Prepared by Howard Cohen**

Before turning to the issue of whether an operating chapter 11 trustee should be appointed, the Court will address whether the Receiver Reports prepared by Howard Cohen, who was not called as a witness, are admissible under the Evidence Rules, and the status of the Motion *in Limine*.

During the Hearings, the Lender sought to introduce SpeyLo Exhibit C, a series of Receivership Reports (collectively, "Cohen Receivership Reports") for the months July 2023 through October 2023, and for the month April 2024. The Debtors object to their admission on the basis that the Cohen Receivership Reports are hearsay and no exception applies. The Lender called Mr. Zucker as a witness to introduce the Cohen Receivership Reports, as he was familiar with the Cohen Receivership Reports when he took over as Receiver from Mr. Cohen.  The Lender argues that the Cohen Receivership Reports are admissible under, among other bases, the business records exception to hearsay.  Evidence Rule 803(6), provides an exception to the hearsay rule for a record of an act, event, condition, opinion or diagnosis if:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).

"The business records exception has been construed generously in favor of admissibility, due to the general trustworthiness of the regularly kept records and the need for this type of evidence in many cases." *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities, LLC*, 610 B.R. 197, 222 (Bankr. S.D.N.Y. 2019) (quoting *Arista Records LLC v. Lime Group, LLC*, 784 F.Supp.2d 398, 421 (Bankr. S.D.N.Y. 2011)); *see also In re Ollag Const. Equipment Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) ("Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all.") (internal citations and quotations admitted).

The Cohen Receivership Reports satisfy the elements of Evidence Rule 803(6). Mr. Zucker testified that he was familiar with the Cohen Receivership Reports as being included in the file assembled by Mr. Cohen during his receivership and transferred to Mr. Zucker upon his appointment as the replacement receiver [*see* 03/13/2026 Trial Tr., pp. 17−21]. The Cohen Receivership Reports were generated at or near the time of the reporting periods. Mr. Zucker testified that he and Mr. Cohen were under a duty to submit such reports pursuant to the Receivership Order [*see* 03/13/2026 Trial Tr., p. 77]. Therefore, the Court finds that the Cohen Receivership Reports were prepared by someone with knowledge. The Cohen Receivership Reports were kept in the course of filing receivership reports on a regular basis as directed by the State Court and there is no basis to find that either Mr. Cohen or Mr. Zucker lack trustworthiness.

The fact that Mr. Zucker was not the author of the Cohen Receivership Reports is not a bar to their admissibility. "[T]he 'custodian or other qualified witness' who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the record-keeping entity, as long as the witness understands the system used to prepare the records." *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 456 (Bankr. S.D.N.Y. 2007) (citing

*Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1997)) (internal quotation marks omitted). Mr. Zucker, who replaced Mr. Cohen as Receiver, was aware of Mr. Cohen's practice with respect to the Cohen Receivership Reports as Mr. Zucker took over the responsibilities and was charged with complying with the State Court's directives as well. Therefore, the Cohen Receivership Reports are admissible under the business records exception to hearsay.

## B. The Motion *in Limine*

Prior to commencement of the Hearings, SpeyLo filed the Motion *in Limine* seeking to prohibit the Debtor from introducing certain exhibits and testimony based on lack of relevance under Evidence Rule 401 and/or *res judicata*. The Court decided to hold a ruling on the Motion *in Limine* in abeyance pending the conclusion of the Hearings. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. L.E. Meyers Co. Grp.*, 937 F.Supp. 276, 287 (S.D.N.Y. 1996) (citing *Hawthorne Partners v. AT&T Technologies, Inc*., 831 F.Supp. 1398, 1400 (N.D. Ill. 1993) (unless the evidence at issue is clearly inadmissible on all potential grounds, evidentiary rulings should be held in abeyance until trial so it can be viewed in the proper factual context.). Based on the evidence actually introduced at the Hearings[3], the only exhibits at issue for the Court are Debtors' Exhibits 2, 3, 4, 6, 46, 22 and 23. The only applicable witness testimony is that of Paul Bigler, who was called by the Debtors.

Evidence Rule 401, made applicable to this contested matter by rule 9017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), allows the Court to preclude the use of irrelevant evidence. Evidence is relevant if it "has any tendency to make a fact more or less probable . . . ." FED. R. EVID. 401(a). Irrelevant evidence is inadmissible. Evidence Rule 403 provides that even relevant evidence can be excluded if "its probative value is substantially

---

[3] The Motion *in Limine* was based upon the Debtors' list of proposed exhibits.

outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

First, with respect to Mr. Bigler's testimony, Mr. Bigler testified about his employment as a manager for the Debtors some time in 2019 through July 2020, and thereafter in November, 2020, when Mr. Bigler became a consultant for Nebari. In his role with Nebari, Mr. Bigler was involved with the DACA as well as allocating the Debtors' income towards expenses. Mr. Bigler also testified regarding the general management of the Quarry operations and the inability of the Quarry to generate sufficient income to cover its expenses. Statements related to an alleged nefarious relationship between Mr. Bigler when he was employed as a manager for the Debtors and his decision to work for Nebari was not the focus of his testimony, and in the Court's opinion, his testimony failed to establish any inappropriate relationship.

Second, as to the exhibits, the exhibits introduced at the Hearings which were the subject of the Motion *in Limine* can be grouped as follows: (a) those related to SpeyLo's standing to seek the appointment of a chapter 11 trustee [Debtors' Exs. 2, 3, 4 and 6]; (b) the contract of sale with Scannell [Debtors' Ex.  22]; (c) Nebari's answer to a complaint filed by the Debtors in State Court in which Nebari seeks a declaratory judgment that any sale of the Yaphank Properties without Nebari's consent would be null and void [SpeyLo Ex. 23]; and (d) a letter dated January 31, 2022 from Vinagro to the Debtors stating that Nebari advised Vinagro that the Debtors were in default under the Loan documents [Debtors' Ex. 46]. Presumably, the exhibits unrelated to SpeyLo's standing [Debtors' Exs. 22, 23 and 46] are meant to show that prior to entry of the Judgment of Foreclosure, SpeyLo engaged in conduct aimed to harm the Debtors.

Each of the above-referenced exhibits were admitted throughout the course of the Hearings, thus rendering the *Motion in Limine* moot. Mr. Bigler's testimony was also allowed, except for

specific objections to questions which were individually sustained or granted, as applicable. The evidence subject to the Motion *in Limine* does not have significant probative value to the direct issues before the Court, but they are not excluded from the record.

### A.      The Chapter 11 Trustee Motion

#### 1.      *Speylo Is a Party in Interest with Standing, and the Court is Barred by the* **Rooker-Feldman** *Doctrine from Deciding Otherwise*

As the Debtors correctly state, only a "party in interest" may seek the appointment of a chapter 11 trustee. 11 U.S.C. § 1104(a). While the term "party in interest" is not defined in the Bankruptcy Code, it includes the debtor, the trustee, a creditors' committee, an equity securityholders' committee, a creditor, an equity security holder, or any indenture trustee. 11 U.S.C. § 1109. The term "party in interest" is to be broadly interpreted.  *In re Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). SpeyLo asserts it has standing to bring the Chapter 11 Trustee Motion as a secured creditor, by virtue of the Judgment of Foreclosure, and that the Debtors are barred by the *Rooker-Feldman[4]* doctrine from arguing otherwise. The Court agrees with SpeyLo.

Under the *Rooker-Feldman* doctrine, federal courts generally lack subject matter jurisdiction over matters "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 281 (2005). The *Rooker-Feldman* doctrine applies to cases satisfying a four-part test: "(1) the federal-court plaintiff lost in state court; (2) the plaintiff 'must complain of injuries caused by a state-court judgment'; (3) the plaintiff 'must invite [federal] court review and

---

[4]  *Rooker v. Fidelity Trust Co*., 263 U.S. 413  (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

rejection of that judgment'; and (4) 'the state-court judgment must have been rendered before the [federal] court proceedings commenced.'" *In re Moise*, 575 B.R. 191*, 200−01 (Bankr E.D.N.Y. 2017) (citing *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009)).

A close reading of the record of the proceedings in State Court supports application of the *Rooker-Feldman* doctrine to the Debtors' standing allegations. It is undisputed that the Debtors lost in the State Court Foreclosure Action and that the Judgment of Foreclosure was issued prepetition. The Debtors now seek a finding by this Court that the Loan was never properly assigned from Nebari to SpeyLo under applicable law and, therefore, the Judgment of Foreclosure does not confer upon SpeyLo, as Nebari's assignee, standing as a creditor of the Debtors. However, if the Court were to decide on the validity of the assignment of the Loan from Nebari to SpeyLo, the Court would have to review issues already raised and rejected in the Foreclosure Action by the State Court.

SpeyLo identified in its post-trial brief over ten submissions by the Debtors to State Court challenging SpeyLo's standing, none of which were entertained by State Court [*see* ECF No. 102, pp. 39−40]. For example, in a memorandum of law in support of the Debtors' motion to reargue the Judgment of Foreclosure [Foreclosure Action, Index No. 616939/2021, NYSCEF No. 451], the Debtors alleged that the assignment of the Loan was a "sham transaction" and a fraudulent conveyance, or that SpeyLo did not fully comply with the requirement to produce the assignment documents. In their reply papers in the same proceeding [Foreclosure Action, Index No. 616939/2021, NYSCEF No. 608], the defendants — *i.e.*, the Debtors — raised the exact issue regarding the sufficiency of the assignment of the Note from Nebari to SpeyLo, alleging that the "failure to attach the note to the allonge or the note to the assignment agreement raises a threshold question about whether the note was properly transferred at all." [Foreclosure Action, Index

12

No. 616939/2021, NYSCEF No. 608, p. 6]. Another example is in the Debtors' April 30, 2025 memorandum of law filed in State Court in opposition to the motion for judgment of foreclosure and sale and in support of the Debtors' cross-motion rejecting the referee's report and for other relief, including vacating the Judgment of Foreclosure [Foreclosure Action, Index No. 616939/2021, NYSCEF No. 980]. In their memorandum of law, the Debtors argued that an allonge which is physically separate from the note is legally ineffective to assign the note. The Debtors also argued that even if the "allonge defect" could be overlooked, "the purported assignment from Nebari to [SpeyLo] suffers from a separate fatal infirmity: its self-contradictory 'Additional Terms' that permit Nebari to retain substantial control over SpeyLo's 'management' and 'actions' while extracting ongoing fees." [Foreclosure Action, Index No. 616939/2021, NYSCEF No. 120]. The Debtors argued in another submission that "this arrangement fundamentally undermines the legal validity of any purported transfer." [Foreclosure Action, Index No. 616939/2021, ECF No. 980, p. 7]. Each of these arguments were raised before the State Court other times as well, were ignored or rejected, and are repeated before this Court in connection with the Debtors' arguments against SpeyLo's standing.

The language of the Judgment of Foreclosure refutes the Debtors' claim that the State Court never considered these legal arguments. The Judgment of Foreclosure expressly defines the "plaintiff" as having the meaning given to it in the affirmation of Barry G. Felder, Esq. [SpeyLo Ex. AA] (the "Felder Affirmation"), submitted in support of confirmation of the referee's oath and report and judgment of foreclosure and sale. The Felder Affirmation recites, "[o]n April 7th 2022, [Nebari], the original lender under the loan, assigned all of its right, title, and interest in the loan to [SpeyLo] which is the current owner and holder of the note and mortgage." [SpeyLo Ex. AA]. A subsequent determination by this Court would indeed do violence to the Judgment of

13

Foreclosure as it adopts the definition given in the Felder Affirmation. The Debtors' argument that this Court retains independent authority to determine whether SpeyLo is a "party in interest" before this Court, regardless of what the State Court decided already on this issue, does not cleanse the Debtors from the application and effect of *Rooker-Feldman*. As already determined by the State Court, SpeyLo is a party in interest as the holder of the Judgment of Foreclosure and, therefore, has standing to file and prosecute the Chapter 11 Trustee Motion. Having overruled the Debtors' challenge to SpeyLo's standing, the Court will turn to the merits of the Chapter 11 Trustee Motion.

### 2. *Bankruptcy Code § 1104*

Bankruptcy Code § 1104 provides in relevant part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause; or

> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate.

11 U.S.C. § 1104(a).

The appointment of a chapter 11 trustee is an extraordinary remedy and the moving party must establish "cause" by clear and convincing evidence. *In re Euro-Am. Lodging Corp*., 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (citing *In re University Heights Ass'n, Inc.*, No. 06-12672, 2007 WL 316281, at *2 (Bankr. N.D.N.Y. Jan. 22, 2007); *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989)). A finding of "cause" is within the court's discretion. *In re Sharon Steel Corp*., 871 F.2d at 1226. Whether to appoint a chapter 11 trustee must be determined on a case-by-case basis. *In re*

14

*Marvel Ent. Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998).  Finally, the Court is mindful of the fact that the appointment of a trustee "may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code" by incurring additional administrative expenses and potentially causing further delays in the bankruptcy proceedings. *In re Bayou Group, LLC*, 564 F.3d 541, 547 (2d Cir. 2009) (citing *Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc.* (*In re Anchorage Boat Sales, Inc.*), 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980)).

      a.   Bankruptcy Code § 1104(a)(1)

Dishonesty, incompetence, or gross mismanagement of the debtor's affairs each constitute cause to appoint a trustee under this subsection, and it is within the Court's discretion to determine whether a debtor's conduct "rises to a level sufficient to warrant the appointment of a trustee."  *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 463.  If the Court finds cause under this subsection by clear and convincing evidence, the appointment of a trustee is mandatory. *Id.* at 474.

SpeyLo relies primarily on allegations of gross mismanagement or incompetence by the Debtors to establish cause under subsection (a)(1).  In support of its argument, SpeyLo highlights: (a) the Debtors' inability to generate positive cash flow; (b) the Debtors' failure to secure a cohesive work plan for operating the Quarry; (c) the Debtors' inability to maintain adequate water management with respect to the retention ponds at the Quarry; (d) the Debtors' refusal to notify or consult with the Receiver with respect to entering into certain contracts and hiring employees; and (e) the issuance of an order by the Department of Environmental Conservation in February 2019 regarding illegal mining of sand at the Yaphank Properties.

The Court has carefully examined the Debtors' prepetition conduct, thoughtfully considering the testimony offered at the Hearings as well as the arguments made by the parties at the Hearings and in the briefs, and concludes that there is insufficient cause to appoint a chapter

11 trustee in these cases under Bankruptcy Code§ 1104 (a)(1).  The Court does not believe that the evidence supports a finding of dishonesty, incompetence or gross mismanagement by clear and convincing evidence, at least in part because the Debtors did not maintain sole and exclusive control over their operations, and in part because their actions taken in contravention of the Receiver's or Lender's wishes or advice were never truly hidden, and were taken in an effort to improve operations and profitability. The Receiver, who has a great degree of control or at least oversight and gatekeeping over the Debtors' operations and certainly their finances, has been in place since May 2023 and bears some responsibility for the management of the Debtors' assets during the past several years — even if that responsibility was directly controlled by the Lender. Thus, unlike the debtor in *In re U.S. Communications of Westchester, Inc*., 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991), where the debtor failed to properly control cash, inventory, or orderly books and records to the point that they were found to be unauditable, here there were several levels of control — the Receiver, the Property Manager, and the Lender. Perhaps the levels of control were part of the problem. Likewise, there is no evidence of self-dealing by management that would cry out for an independent third party to ensure a thorough investigation of management's conduct. *See In re Soundview Elite, Ltd*., 503 B.R. 571, 582 (Bankr. S.D.N.Y. 2014). The only allegations of self-dealing here were explained to the satisfaction of this Court and there is no evidence that the Debtors committed fraud.

The court's reasoning in *In re Vascular Access Centers, L.P.*, 611 B.R. 742 (Bankr. E.D. Pa. 2020), cited by SpeyLo, does not apply to the facts of these cases. In the *Vascular Access Centers* case, the debtor's principal engaged in self-dealing and had multiple conflicts of interest, commingled the debtor's funds with funds of his wholly-owned entities, maintained inadequate record keeping, had unreliable financial statements, and the court there found the principal to be

"dishonest, not credible, incompetent, and completely untrustworthy to operate [the debtor] and guide [the debtor] through . . . chapter 11." *In re Vascular Access Centers, L.P.*, 611 B.R. at 769. Here, the Court finds the Debtors' principal's testimony to be trustworthy and credible. Mr. Fernandez did not attempt to hide or misrepresent his actions over the last few years with respect to the Receiver, the Property Manager, or the Lender [*see* 03/12/2026 Trial Tr., pp. 52, 65].  In fact, Mr. Fernandez spoke openly about the reasons for his actions and how he thought the Debtors' operations could be improved if he had the funding and latitude to do so. Even the Receiver's testimony supported the Debtors' principal's honesty and desire to improve operations and profitability. It appears that a large part of the Debtors' operational issues stem from mistrust by and among the parties, but not necessarily in the Debtors' management's credibility.

Likewise, the facts of *In re Marvel Entertainment Group, Inc.* are inapposite. In the *Marvel Entertainment Group* case, certain entities controlled by Carl Icahn, which had purchased debt claims and bonds at a discount, took control of the debtor after the petition was filed and immediately engaged in certain conduct adverse to the debtor's lenders.  In affirming the district court's decision to appoint a trustee, the Court of Appeals for the Third Circuit concluded that the Icahn-controlled interests that took control over the debtor's management were <u>not</u> entitled to a presumption against the appointment of a chapter 11 trustee. As the Third Circuit stated: "[w]e are not confronted with a debtor who possesses extensive familiarity with the company's operations. It is therefore inappropriate to suggest that the usual presumption should be applied to a Johnny-come-lately debtor-in-possession, especially one that is also a substantial creditor." *In re Marvel Entertainment Group, Inc*., 140 F.3d at 471.

Here, it is undisputed that the Debtors' principal has extensive knowledge of the Debtors' history and has been intimately involved with their daily operations since he acquired the

17

businesses. This Court believes that Debtors' management is entitled to the presumption against the appointment of a chapter 11 trustee, especially here where Debtors' management has not had exclusive control over operations for years, was fighting litigation with its secured creditor with insufficient capital to properly remedy internal operational issues, and then was saddled with a receiver and property manager and their related costs, expenses, delay and oversight. In addition, the Court does not give significant weight to SpeyLo's reliance on certain of the Debtors' prepetition conduct to establish cause, some of which reaches back six years — seemingly the last time the Debtors had even the appearance of control over their own operations.

The Court similarly believes that an operating trustee is unnecessary given the timing and likely future course of these cases. Outside of the bankruptcy proceedings, the stay has been vacated for the purpose of permitting oral argument with respect to certain appeals before the State Court. The only other matters of significance in these cases are a possible sale of the Quarry and the Yaphank Properties, the treatment of SpeyLo's claim, and the extent to which the Debtors object to SpeyLo's proof of claim. This is not a situation where there are multiple parties and a strategy has yet to be formulated, which might warrant the appointment of a trustee to right the ship. Here, the parties agree that a sale is in the Debtors' future.

To that end, SpeyLo argues that the Quarry has not been profitable for years, if ever, and relies upon testimony of its experts to support the conclusion that the Quarry's operations should be *de minimis* unless and until a buyer is secured in order to save costs and expenses, and also to preserve the land for a potential buyer [*see* 03/23/2026 Trial Tr., pp. 32−33, 96]. SpeyLo argues that this weighs in favor of the appointment of a chapter 11 trustee, because he or she would likely reduce operations, saving costs and preserving rock for a future buyer [*see* 03/23/2026 Trial Tr., p. 96].

18

But SpeyLo's argument fails to address a crucial issue raised by the Debtors in direct contravention of those conclusions — reducing operations at the Quarry to the bare minimum could jeopardize the Debtors' necessary and valuable permits, which are also highly desirable for any future buyer [*see* 03/26/2026 Trial Tr., pp. 122−124]. Even if a future buyer is uninterested in the Debtors' operations, certainly any buyer would require the Debtors' permits. SpeyLo concedes that reducing operations to a bare minimum could risk the good standing of the Debtors' permits, however small the risk [ECF No. 107, p. 7, fn. 4]. SpeyLo's (and the Receiver's and Property Manager's) failure to give appropriate weight to the value of the permits, as opposed to the Debtors' clear understanding of their value and importance, further supports denying the Chapter 11 Trustee Motion. Operations can always be reduced or later shutdown, if necessary, but it appears to this Court that once a shutdown is effectuated, it might be difficult, if not impossible, to ramp up without risking loss of permits, among other consequences.

For all of these reasons, SpeyLo has not established cause for the appointment of a trustee under Bankruptcy Code § 1104(a)(1) by clear and convincing evidence.

b.  Bankruptcy Code § 1104(a)(2)

Unlike Bankruptcy Code § 1104(a)(1), appointment of a trustee under subsection 1104(a)(2) is not mandatory, and courts employ an inquiry that is "flexible" and is intended to satisfy the "practical realities and necessities" of each case. *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (internal citations and quotations omitted). "Courts construing this subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interest of the estate." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (quoting *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)).

19

In assessing whether appointment of a chapter 11 trustee is in the interests of creditors, courts routinely consider the following factors:

> (a) the trustworthiness of the debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the confidence — or lack thereof — of the business community and of creditors in present management; and (d) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment.

*In re Sillerman*, 605 B.R. 631, 652 (Bankr. S.D.N.Y. 2019) (other citations omitted). Courts also consider whether current management has material conflicts of interest and whether they are in a position to credibly investigate possible claims for the benefit of creditors. *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008).

This is a flexible, fact-specific inquiry, and the Court gives significant weight to the fact that both the Debtors and SpeyLo agree that the Properties should be sold. Accordingly, the outcome of these cases should be relatively straightforward, with timing and parameters controlled by orders of this Court. Under those guidelines, the Court will now examine the four factors enumerated above.

### i.    *Trustworthiness of the Debtors*

The conduct SpeyLo relies upon to satisfy this factor — trustworthiness of the Debtors, or a lack thereof — primarily concerns actions taken several years ago as reported by the Receiver and the Property Manager. The Debtors' operations have been subject to the Receivership Orders, which remain in effect. SpeyLo introduced Exhibit T, the affirmation of Mr. Zucker (the "Zucker Affirmation"), which was filed in the Foreclosure Action. In the Zucker Affirmation, Mr. Zucker disputed the Debtors' assertion that the Receiver was in control of the daily operations of the Quarry, that the Quarry was not profitable due to the Receiver's fees, and that the Receiver and Property Manager were not adding value to the Quarry's operations. In addition to these arguments

20

made by the Debtors in the Foreclosure Action, SpeyLo points to the Debtors' failure to advise the Receiver that: (a) a forbearance agreement with Sandvik, who was about to seize critical equipment at the Quarry, had been executed; (b) the Debtors executed a settlement agreement with Union 825; and (c) the Debtors commenced an action against Lopke Quarries, Inc. ("Lopke") in March 2025. SpeyLo also introduced Exhibit Z, an affidavit of the Property Manager, dated December 19, 2023, filed in the Foreclosure Action. In this affidavit, Mr. Harris disputed Mr. Fernandez's allegations that the Receiver and/or the Property Manager were attempting to take over the Quarry and alleged that Mr. Fernandez failed to listen to his advice to the detriment of the Debtors' creditors.

While the Court is not discounting SpeyLo's allegations, which are supported by documentary evidence, it is worth noting and certainly relevant to the Court that all of the conduct took place prepetition, was taken in the Debtors' best interests and in some cases the Receiver admitted was likely in the Debtors' best interests, and to date in these chapter 11 cases, the Debtors have not acted in dereliction of any of this Court's orders. The Debtors appear to have taken certain legal positions in the Foreclosure Action that are based on opinion more than fact, but to date the Court has not found the Debtors to be untrustworthy. The Court found Mr. Fernandez to be a credible witness interested in preserving value, repaying creditors, and salvaging the Quarry, whether for a reorganization or a sale. As stated, the explanations offered by the Debtors for their actions taken against the advice of the Receiver and/or Property Manager do not rise to the level of fraud, dishonesty, or actions taken in direct contravention of creditors' interests.

*ii.    The Debtors' past and present performance and prospects for reorganization*

To make findings regarding the Debtors' past and present performance, the Court may look to the Debtors' prepetition and postpetition conduct. *In re Sillerman*, 605 B.R. 631, 654 (Bankr. S.D.N.Y. 2019) (citing *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007)). It

21

is undisputed that the Debtors have suffered operating losses prepetition and may continue to do so while in these chapter 11 cases. However, the parties agree that the Properties should be sold, that many of the Debtors' operational issues stem from a lack of capital, and the Debtors reported to the Court that they have already begun soliciting offers from interested parties. Accordingly, at this time, the Debtors are not aiming to reorganize and continue operations post-confirmation. For the months that remain before the Properties are sold, the most important issue will be the size of the bids for the Debtors' assets (and, of course, preserving their value for future bidders), not the income generated. The Court is also of the opinion that selling the Quarry as a going concern, with all current permits intact, is far less risky than shutting down operations or reducing them to a near standstill and hoping the permits remain valid. Claims that the Debtors failed to develop a plan for mining the Quarry, or that the Debtors failed to maintain the equipment at the Quarry, are largely irrelevant at this point and can easily be attributed to a lack of capital, disruption from litigation, and excessive levels of operational oversight by the Lender, the Receiver and the Property Manager. There is also insufficient evidence to support a finding by this Court that the Debtors' books and records are in disarray. The Property Manager testified that the Debtors' books did not include certain invoices to Lopke for services an employee of the Debtors provided in Lopke's stead [*see* 03/23/2026 Trial Tr., p. 133]. In addition, Mr. Zucker testified that the Debtors had trouble paying creditors on time when there was insufficient cash flow [*see* 03/12/2026 Trial Tr., pp. 66−69]. The discrepancy between what Lopke claimed was owed ($735,000.00) and what the Debtors' books reflected ($338,000.00) was never explored on the record, and it is not clear why this discrepancy existed [*see* 03/12/2026 Trial Tr., p. 68], but for the most part, the Receiver seemed concerned with the Debtors' insufficient income to pay creditors, which is not evidence of poor record keeping. These examples do not appear to amount to inadequate record keeping.

### iii. _Confidence of creditors_

SpeyLo, the Debtors' largest creditor, indicated it has lost any confidence in the Debtors and claims that Mr. Fernandez is more interested in keeping the Debtors' assets for the benefit of his family over repaying SpeyLo [*see* ECF No. 103, pp. 27−28]. But the Debtors consented to sell their assets in these cases under the Court's supervision, which severely undercuts this argument. SpeyLo might not be happy with certain aspects of these cases (for example the Debtors will likely object to SpeyLo's claim), but that is no basis to appoint a chapter 11 trustee. Further, the Court is present to ensure that there is a forum for just and speedy resolutions of any issues that arise.

Last, even if the Debtors ultimately do not sell the Properties (this Court does not see any reason to bind the Debtors to that outcome today), they can only do so while in compliance with the Bankruptcy Code and the Bankruptcy Rules, observing priority and related restrictions. Thus, absent a showing of gross mismanagement, fraud, or dishonesty by clear and convincing evidence, at this early stage in the Debtors' cases, the failure to maintain the confidence of a debtor's largest secured creditor with whom they have been in litigation for years is insufficient to warrant the appointment of a chapter 11 trustee. There is nothing convenient about filing chapter 11 cases, and the level of oversight and transparency required of debtors-in-possession (as well as the consequences for failing to do so) support the presumption against the appointment of a chapter 11 trustee — again, at this time.

### iv. _Benefits of appointing a trustee versus costs_

Under this factor, the Court must weigh the costs of appointing a trustee against the benefits. In re _Sillerman_, 605 B.R. at 655; In re _Taub_, 427 B.R. at 229. The first cost of appointing an operating trustee is financial, and the burden it places on an already financially distressed debtor seems obvious. The second cost of appointing an operating trustee is administrative, and the burden

23

it places on a debtor that has lived with two receivers and a property manager, all without sufficient capital, seems equally obvious. SpeyLo argues that a trustee is better positioned to control operations and oversee the sale process, and that a trustee will likely abandon what SpeyLo deems to be unnecessary and costly litigation in State Court. The Court believes the Debtors are capable of administering a transparent and equitable sale process without the burden of additional administration expenses. The Court also believes that the Debtors' operations should not at this stage be saddled with additional costs. The Court vacated the stay to permit certain aspects of appeals pending in State Court to go forward, but any further action in State Court requires permission from this Court, so a trustee is not required to curb unnecessary and costly litigation. In addition, the Court is not inclined to stall these chapter 11 cases awaiting results in State Court and has already directed the Debtors to file a plan and further the sale process within the next several weeks [*see* 04/21/2026 Hearing Tr., p. 41]. In sum, the Court finds that the added costs of appointing a chapter 11 trustee to the Debtors' estates outweighs any benefit.

B.     **Excusing the Receiver from Compliance with Bankruptcy Code § 543**

SpeyLo seeks to excuse the Receiver from the turnover requirements of Bankruptcy Code § 543 in the event the Court declines to appoint a chapter 11 trustee. Generally, upon obtaining knowledge of a bankruptcy proceeding, any "custodian" of a debtor's property: (i) may only disburse or take any action in the administration of property of the estate to preserve such property; (ii) must turn over to the debtor any and all property of the debtor that was held by or transferred to the custodian, including proceeds, product, offspring, rents, or profits of such property; and (iii) must file an accounting of such property. *See* 11 U.S.C. §§ 543(a) and (b); *see also In re 245 Assocs., LLC*, 188 B.R. 743, 748 (Bankr. S.D.N.Y. 1995); *In re Constable Plaza Assocs.*, 125 B.R. 98, 102 (Bankr. S.D.N.Y. 1991).

Bankruptcy Code § 543(d)(1) provides an exception to the turnover requirement imposed on a custodian. Specifically, section 543(d)(1) provides, in pertinent part, that after notice and hearing, the bankruptcy court "may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, if equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property . . . ." 11 U.S.C. § 543(d)(1). The Court may continue the receivership and excuse a receiver from the turnover and accounting requirement if such result better serves the interests of the creditors. *In re 245 Assocs., LLC*, 188 B.R. at 748–49; *In re Uno Broad. Corp.*, 167 B.R. 189, 200 (Bankr. D. Ariz. 1994); *In re Northgate Terrace Apartments, Ltd*., 117 B.R. 328, 333 (Bankr. S.D. Ohio 1990); *In re Poplar Springs Apartments of Atlanta, Ltd*., 103 B.R. 146, 149–50 (Bankr. S.D. Ohio 1989).

In considering whether to exercise discretion under section 543(d)(1) to excuse a custodian from turnover, courts examine several factors bearing on whether the "interests of creditors" standard articulated in section 543(d) is satisfied: (a) whether there will be sufficient income to fund a successful reorganization; (b) whether the debtor will use the turnover property for the benefit of the creditors; (c) whether there has been mismanagement by the debtor; (d) whether there are avoidance issues raised with respect to property retained by a receiver; and (e) the fact that the bankruptcy automatic stay has deactivated the state court receivership action. *Dill v. Dime Sav. Bank, FSB* (*In re Dill*), 163 B.R. 221, 225 (E.D.N.Y. 1994) (citing *Constable Plaza Assocs.*, 125 B.R. at 103–04).

Based on an analysis of the above factors, the creditors will be best served if the Debtors, with the oversight of this Court, manage their operations without the Receiver and Property Manager. First, with respect to whether the Debtors have sufficient income to fund a successful

reorganization, they plan to sell their assets and, therefore, keeping the Receiver and Property Manager in place will not improve profitability. Also, keeping the Receiver in place pending a sale will most likely have no effect on the ultimate sale price. Further, SpeyLo will have some degree of control over how the Debtors' income is spent, because Speylo has a lien on the Debtors' cash. Second, as noted, the Debtors intend to use the sale proceeds from the Properties to fund a plan, so they will use the turnover property for the benefit of creditors. Third, as examined at length previously, there does not appear to be an extensive history or current environment of gross mismanagement by the Debtors. The Court has thoroughly analyzed the allegations of mismanagement and believes that the curbs imposed by this Court will ensure that the Debtors act in the best interest of its creditors. Fourth, with respect to potential avoidance actions, there is little in the record to date to indicate that there will be avoidance actions to pursue. Last, the fact that the stay has deactivated the receivership weighs against keeping the Receiver in place. The Receiver reports to the State Court, which may impose different requirements and may approve or disapprove different expenditures than this Court. For these reasons, and for the same reasons the

request to appoint a chapter 11 trustee are denied, this portion of the Chapter 11 Trustee Motion is denied as well.

### A. <u>CONCLUSION</u>

For the reasons set forth above, the Chapter 11 Trustee Motion is **DENIED**, and the Motion *in Limine* is **DENIED**.



Dated: Central Islip, New York

May 21, 2026

_____

Sheryl P. Giugliano

United States Bankruptcy Judge

27