SQUIRE PATTON & BOGGS LLP
Katherine R. Catanese, Esq.
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
Telephone: (212) 872-9836
Email: katie.catanese@squirepb.com

SQUIRE PATTON & BOGGS LLP
Christopher J. Giaimo, Esq.
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Email: christopher.giaimo@squirepb.com

*Counsel for SpeyLo Holdings, LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:

| | |
|---|---|
| SPEYSIDE HOLDINGS LLC<br>d/b/a SPEYSIDE SAND & STONE,<br>SPEYSIDE HOLDINGS II LLC,<br>CEM III, LLC<br>SGD GROUP HOLDINGS II LLC,<br>SGD GROUP HOLDINGS III LLC,<br>SRG HORSEBLOCK II LLC, and<br>SRG HORSEBLOCK IV LLC,<br><br>Debtors. | Chapter 11<br><br>Case No. 26-70730-spg<br><br>(Jointly Administered) |

-------------------------------------------------------X

**LENDER'S NOTICE OF INTENT TO SUBMIT CREDIT BID AND**
**<u>OBJECTION TO DEBTORS' NOTICE OF EXTENSION OF SALE DATES</u>**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........ 1

A. The Debtors Violated the Amended Bidding Procedures Order ........ 2

B. The Debtors Violated the Cash Collateral Orders ........ 3

C. The Debtors Violated the DEC Consent Order ........ 4

BACKGROUND ........ 6

LAW AND OBJECTION ........ 11

A. The Court Should Enforce the Amended Bidding Procedures Order as Written ........ 11

B. The Extension Notice Is Ineffective Because the Lender Did Not Consent ........ 12

C. The Late-Emerging Bidders Do Not Justify Overriding the Lender’s Rights ........ 13

RESERVATION OF RIGHTS ........ 14

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bigler, LP*,
443 B.R. 101 (Bankr. S.D. Tex. 2010) ....................12

*In re Metaldyne Corp.*,
409 B.R. 661 (Bankr. S.D.N.Y. 2009) ....................11

*In re Motors Liquidation Co.*,
829 F.3d 135 (2d Cir. 2016) ....................11

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
114 F.3d 379 (2d Cir. 1997) ....................11

*Newline Holdings, LLC v. Scott*,
No. 21-cv-6346, 2022 WL 17251282 (N.D. Ill. Nov. 28, 2022) ....................11

*Super Stop Petroleum, Inc. v. Clark Retail Enters., Inc. (In re Clark Retail Enters., Inc.)*,
308 B.R. 869 (Bankr. N.D. Ill. 2004) ....................12

*Weigel as Tr. of JNL/Forgione Distribution Tr. v. Barnard*,
661 B.R. 16 (E.D.N.Y. 2021) ....................11

**Statutes**

11 U.S.C. § 105(a) ....................11

SpeyLo Holdings, LLC, as assignee of Nebari Natural Resources Credit Fund, L.P. (the "Lender"), by and through undersigned counsel, hereby submits this notice of intent to submit credit bid and objection (the "Objection") to the Debtors' *Notice of Extension of Bid Deadline and Adjournment of Auction Date* (ECF No. 283) (the "Extension Notice"). In support of this Objection, the Lender respectfully states as follows:

## PRELIMINARY STATEMENT

This Objection is straightforward. The Amended Bidding Procedures Order contains a negotiated, **court-ordered**, outside Closing Date of November 30, 2026—"TIME BEING OF THE ESSENCE"—that may be extended only "with the consent of the Lender." The Lender did not consent. No Qualified Bid was submitted by the Bid Deadline. Under the plain terms of the Court's Amended Bidding Procedures Order, the Lender is the only Qualified Bidder, and it is entitled to proceed with its credit bid. The Debtors cannot rewrite that Order by filing the Extension Notice.

The November 30 deadline was not arbitrary. After the first sale of the Quarry failed, the Lender agreed to a second sale process only on the condition that it be completed expeditiously because its collateral was being eroded and damaged,[1] the Quarry was being mismanaged, and the Debtors' budgets did not resemble reality, with the Debtors in constant noncompliance and unable to pay basic administrative expenses and the costs of the business. The Debtors and the Lender, therefore, agreed on a second sale process that would conclude with a closing on or before November 30, 2026—a critical, bargained-for component of the Amended Bidding Procedures.[2]

[1] *See, for example,* the DEC Consent Order [dkt. 195-2] setting forth post-petition overblasts that "caused the bench to be less than the minimum bench-width required by the approved reclamation plan." ¶ 11-12.
[2] This deadline was deliberately chosen to allow a closing well before year-end.

This Court entered the Amended Bidding Procedures Order, which established November 13, 2026 at 5:00 p.m. as the Bid Deadline; the Lender later agreed, solely because of the widespread Microsoft outage, to a one-business-day extension to November 16, 2026. No bids were received by that deadline. The Lender, accordingly, gives notice that it intends to exercise its credit bid rights under the Amended Bidding Procedures Order.

Rather than comply with the Amended Bidding Procedures Order, the Debtors filed the Extension Notice over the Lender's express and repeated objection. The Debtors and their principal, Mr. Fernandez, are bound by this Court's orders. Yet their conduct reflects a settled view that court orders may be ignored when inconvenient. As the uncontroverted evidence at the evidentiary hearing on the Motion to Appoint a Trustee established, the Debtors routinely disregarded orders entered by the New York Supreme Court in the foreclosure proceeding. That pattern has continued post-petition: the Debtors have now violated, or attempted to circumvent, at least three orders of this Court.

### A. <u>The Debtors Violated the Amended Bidding Procedures Order</u>

Through the Extension Notice, the Debtors attempt to extend the sale deadlines unilaterally, stating that the Lender was consulted, yet intentionally omitting that the Lender *refused* to consent. The Amended Bidding Procedures draw a clear line: the closing must occur on or before November 30, 2026, and that date may be extended *only* with the Lender's consent. The Lender bargained for this consent right precisely because, while it was willing to permit a second sale process, it would not accept an open-ended one, especially while its Cash Collateral Orders were not being adhered to. The Lender did not consent, and the Extension Notice—which sets the Auction *after* the outside Closing Date—cannot be reconciled with the Amended Bidding Procedures Order.

**B. <u>The Debtors Violated the Cash Collateral Orders</u>**

The Debtors have treated the cash collateral orders, and the budgets approved under them, as optional. The Lender recently learned that the Debtors violated the Tenth Interim Cash Collateral Order entered on October 26, 2026 [ECF No. 269] (the "Cash Collateral Order"). The budget approved under the Cash Collateral Order governs the period that includes October 19, 2026, but contains no line item for blasting expenses—expenses the Lender has repeatedly opposed in writing to Debtors' counsel:

| | 33 Week | 34 Week | 35 Week | 36 Week |
|---|---|---|---|---|
| Date | Forecast | Forecast | Forecast | Forecast |
| Week Ending (Friday) | 10/9/2026 | 10/16/2026 | 10/23/2026 | 10/30/2026 |
| Blasting | | | | |

Yet, on October 19, 2026, Mr. Fernandez caused the Debtors to incur more than $60,000 in blasting expenses at the Quarry. The DEC's Mined Land Reclamation staff confirmed to the Lender that it received pre-blast paperwork from Speyside for a blast scheduled for October 19, and the Lender has received an invoice confirming the cost of that unauthorized blast. The Debtors have offered no explanation for this violation. Worse, Mr. Fernandez incurred the expense when the Debtors had no ability to pay it—and every blast permanently removes stone that is the Lender's collateral.

At the same time, the Debtors were failing to pay employee welfare benefits and the accumulating DEC fines. At the October 29, 2026 hearing, counsel for both the DEC and the welfare benefit fund informed the Court that the Debtors had not paid the amounts required under the then-operative cash collateral order, even though those payments were included in the approved budget:

| Date<br>Week Ending (Friday) | 33<br>Week<br>Forecast<br>10/9/2026 | 34<br>Week<br>Forecast<br>10/16/2026 | 35<br>Week<br>Forecast<br>10/23/2026 | 36<br>Week<br>Forecast<br>10/30/2026 |
|---|---|---|---|---|
| Insurance: Health and Benefits (Oxford - Slim/Eugene) | | | | (15,477) |
| Insurance: Local 825 Welfare (Health) Insurance for J. Sauro and J.D. Sauro - Union Employees | (8,960) | | | (8,960) |

Rather than seek emergency relief, the Lender agreed to the continued use of cash collateral under a further order with stricter terms, in the hope that the Debtors would comply during the few weeks remaining before the sale closed. That accommodation was premised on a closing on or before November 30, 2026, as the Amended Bidding Procedures Order already required. As stated above, the Debtors violated the Cash Collateral Order.

**C. <u>The Debtors Violated the DEC Consent Order</u>**

This Court entered an order approving the settlement between the Debtors and the DEC (the "Consent Order") [ECF No. 223], which required the Debtors to pay certain fines and provide a remediation plan for the Quarry. As the Consent Order reflects, the Debtors intentionally, or at the very least negligently, violated numerous environmental regulations governing the operation of the Quarry, resulting in the DEC's assessment of violations and fines. The Consent Order requires, among other things, expedited remediation of physical violations and payment of penalties. As this Court is aware, the Debtors have not complied, and Mr. Fernandez has made clear through his actions and words that the Debtors have no intention of complying.

The consequences of that noncompliance are not abstract. The Debtors' failure to complete the required survey and remediation plan was central to the initial buyer's, Vanderbilt Holding Corp.'s, refusal to close on the initial timetable. Vanderbilt told the Court that the parties needed clarity on "what needs to be done in order to satisfy the consent order" and "how much that will cost," and argued that closing before those issues were resolved would either prevent it from

operating the business on day one or force it to bear "the expense and burden of bringing the facility into compliance . . . a liability that it didn't bargain for under the sale order." See Tr. of Oct. 6, 2026 Hr'g at 20:9–21:3, 22:1–23. The Debtors' violation of the Consent Order thus already cost these estates one sale.[3]

Court orders are not suggestions. The Debtors have repeatedly treated them as obstacles to be worked around rather than obligations to be obeyed, and that disregard has directly harmed these estates and the Lender. The Court should enforce its orders as written—including the Amended Bidding Procedures Order—and bring that pattern to an end.

For nine months, the Debtors have continued to operate the Quarry and erode the Lender's collateral through blasting and unauthorized use of cash collateral.[4] The Debtors asserted that operating the Quarry was necessary to preserve value for an eventual sale.[5] But, as the Court observed in April, in connection with authorizing the Debtors' use of cash collateral, that justification has a time limit: "Now, these arguments don't last forever, right? Those arguments are compelling now at this hearing, but if six weeks from now, we're sitting here and those same arguments are being made, they're less convincing, obviously." *See* April 21, 2026 Hr'g Tr. 37:19-22 [ECF No. 108]. That time has run out.

[3] None of this excuses Vanderbilt's withdrawal from the sale.
[4] *See* Mar. 23, 2026 Hr'g Tr. 96:21–97:1 (Debtors' counsel stating that "there's a finite amount of material in quarry. It's not unlimited, right? If you have a farm, you can harvest all of the crops, and you can replant, and you can get more crops. In a quarry, when you blast and dig out, and you crush, that area, that stone is gone for our lifetimes and a lot longer.").
[5] *See* Gary C. Fischoff's April 17, 2026 Letter to the Court ("A fully functioning quarry will enhance its value for the contemplated sale of the business.").

## BACKGROUND

*a. The Chapter 11 Cases*

1. On February 20, 2026 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). *See* ECF No. 1. On February 27, 2026, the Court entered an order directing the joint administration of the Debtors' cases under the above-captioned lead case. *See* ECF No. 34.

2. Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtors have continued in possession of their property as debtors-in-possession.

3. No creditors' committee has been appointed, leaving no one in place to oversee or police the Debtors' actions at this stage of the case.

*b. The Debtors' Use of Cash Collateral and Assurances of a Prompt Sale*

4. On the Petition Date, the Debtors moved for authority to use the Lender's cash collateral (ECF No. 15). The Lender has been continuously patient and cooperative with the Debtors in this regard, with the goal of getting to a sale in early fall. The Court has since entered twelve interim cash collateral orders, and the Debtors have produced twelve budgets in conjunction with approval of cash collateral—these budgets have not been followed and are wholly inaccurate as discussed above.[6]

5. The Debtors have justified the continued operation of the Quarry, including blasting, on the grounds that it would preserve value for a sale. In an April 17, 2026 letter seeking emergency relief, the Debtors told the Court that "[a] fully functioning quarry will enhance its

[6] *See* ECF Nos. 45, 64, 88, 119, 148, 180, 194, 222, 261, 269, 279, and 280.

value for the contemplated sale of the business."[7] Blasting, however, permanently depletes the Lender's collateral—and more than five months have now passed since the sale process began.[8]

*c. The Original Sale Process and Vanderbilt's Failure to Close*

6. On June 3, 2026, the Debtors filed a motion to sell the Quarry and to establish bidding procedures (ECF No. 153), and on June 26, 2026, the Court entered an order approving the original bidding procedures (ECF No. 179).

7. On September 8, 2026, the Court entered an order approving the sale of the Quarry to Vanderbilt (ECF No. 217). The sale failed to close after Vanderbilt alleged that the Debtors' principal had failed to disclose the DEC Consent Order and the true condition of the Quarry.

*d. The Amended Bidding Procedures*

8. The Lender agreed to a second sale process and continued use of cash collateral on a compressed timeline, with a sale to close by November 30, 2026, so that it would be assured of a closing well before year-end. On November 2, 2026, the Court entered its Order approving the Amended Bidding Procedures (the "Amended Bidding Procedures Order").

9. The Amended Bidding Procedures set a compressed, fixed timeline: bids were due by November 13, 2026 at 5:00 p.m. (the "Bid Deadline"); the Auction was set for November 17, 2026 at 10:00 a.m.; and the sale was required to close on or before November 30, 2026. Amended Bidding Procedures ¶¶ F, H, and N. This compressed timeline was justified, as the Quarry was fully marketed by Hilco for the prior five months.

10. Under the Amended Bidding Procedures, the Lender is deemed a Qualified Bidder and may credit bid up to $25 million without submitting a bid by the Bid Deadline or posting a

---

[7] Letter from Gary C. Fischoff to Hon. Sheryl P. Giugliano at 1 (Apr. 17, 2026) (ECF No. 104).

[8] *See* Mar. 23, 2026 Hr'g Tr. 96:21–97:1 (ECF No. 72) (testimony of property manager Greg Harris that "there's a finite amount of material in quarry. . . . In a quarry, when you blast and dig out, and you crush, that area, that stone is gone for our lifetimes and a lot longer.").

deposit. *Id*. at ¶ J. Unless another Qualified Bidder submits a bid, "the Lender's credit bid shall be considered the Backup Bid." *Id*. at ¶ L.

11. Critically, the Amended Bidding Procedures fix the outside closing date and reserve to the Lender the right to consent to any extension of it:

> "The Successful Bidder must close title to the Quarry at a date mutually acceptable to the Successful Bidder and the Debtor in consultation with the Lender (the 'Closing Date') that is no later than November 30, 2026, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely to the Debtor, *with the consent of the Lender*."

*Id*. ¶ P (emphasis added). By contrast, the Debtors may adjourn the Auction Date "in [their] business judgment, after consultation with, and on notice to, the Lender." *Id*. ¶ K. The distinction is deliberate: consultation suffices for the Auction Date and is designed to address issues with *Qualified Bids submitted by the Bid Deadline* prior to the Auction[9], but the Closing Date—the Lender's bargained-for protection—cannot move without the Lender's consent. And, in any event, the Debtors are not permitted under the Amended Bidding Procedures to move the Bid Deadline.[10]

*e. The Bid Deadline Passes and No Bids are Received*

12. On November 13, 2026—the day of the Bid Deadline and more than five months after the sale process began—two new potential buyers surfaced for the first time. The first was a group based in Asia, reportedly backed by Middle Eastern funding, that had been sourced by a Mr. Michael Cox.

[9] *See* Amended Bidding Procedures at ¶ K (i) through (vi) listing the bases for possible adjournments to solely address "Qualified Bids", meaning bids that have been submitted by the Bid Deadline, not to unilaterally extend the Auction as a result of not receiving any bids at all. Similarly, Paragraph F of the Amended Bidding Procedures allows for the Debtors to modify or waive the bid requirements set for in (i) through (xvii) to address certain qualification concerns for bids submitted by the Bid Deadline, not the unilateral extension of the Bid Deadline itself.

[10] The purpose of allowing flexibility to adjourn the Auction but not the bid deadline is to allow for negotiation of higher and better bids—not to extend the marketing process, which is what the Debtors are attempting to do through their Extension Notice.

13. Mr. Cox is not an arm's-length intermediary. He has an intertwined history with the Debtors and, at least as of 2019, held a 9% membership interest in each of Debtors Speyside Holdings LLC and CEM III LLC.[11] Mr. Cox organized CEM III LLC,[12] has been identified by the DEC as a manager of Speyside Holdings LLC,[13] has executed regulatory submissions as Speyside Holdings LLC's "Authorized person,"[14] and is the designated contact for the Quarry's SPDES discharge permit.[15] A last-minute bidder sourced by a Debtor insider raises obvious questions about the independence and good faith of the process.

14. The second potential party that surfaced on the very eve of the extended Bid Deadline has not demonstrated serious interest or financial capacity, and it has provided no proof of funds to date.

15. Because of the widespread Microsoft outage on November 12, the Lender agreed—as an accommodation, and only for that reason—to extend the Bid Deadline by one business day, to November 16, 2026.

16. Because more than five months had passed since the sale process began, and because neither party appeared capable of closing a sale promptly, and at least one was intertwined with the Debtors, the Lender refused to extend the Bid Deadline beyond November 16 and told the Debtors so on at least three occasions before the Bid Deadline.

---

[11] *See* Speyside Holdings LLC Structural Overview (identifying Canyon Bound LLC, sole member Michael Cox, as a 9% member of Speyside Holdings LLC and of CEM III LLC), attached hereto as **Exhibit 1**.

[12] *See* Articles of Organization of CEM III LLC (filed with N.Y. Dep't of State July 13, 2015) (signed by "Michael Cox, Organizer"), attached hereto as **Exhibit 2**.

[13] *See* Letter from Rebecca S. Crist, NYSDEC, to Michael Cox, Speyside Holdings LLC, at 3 (Feb. 15, 2019) ("Michael Cox is listed as a manger [*sic*] of Speyside Holdings LLC . . . ."), attached hereto as **Exhibit 3**.

[14] *See* Letter from Michael Cox, Authorized person, Speyside Holdings LLC, to Kenson Jeffrey, Esq., NYSDEC (Dec. 31, 2020), attached hereto as **Exhibit 4**.

[15] *See* SPDES Discharge Permit No. NY0081311 at 1 (modified Nov. 1, 2021) (Permittee: Speyside Holdings LLC, "Attention: Michael C. Cox"), attached hereto as **Exhibit 5**.

17. No bid was received by the Bid Deadline, as extended. The Lender is, therefore, the only Qualified Bidder.

18. Despite the Lender's clear objection to any further extension and its insistence that the Auction proceed as scheduled on November 17, the Debtors filed the Extension Notice, purporting to unilaterally extend the Bid Deadline to December 4, 2026 at 5:00 p.m. and the deadline for determining Qualified Bids to December 7, 2026. Extension Notice ¶ 3. Invoking ¶ K, the Debtors also adjourned the Auction from November 17, 2026 to December 8, 2026 at 10:00 a.m. *Id.* ¶ 4.

19. In the Extension Notice, the Debtors claim three times that they acted "after consultation with the Lender." *Id.* ¶¶ 3, 4, and 5. Nowhere do they disclose that the Lender expressly refused to agree to the extensions.

20. Further, the Debtors are silent in their Extension Notice regarding the requirement in the Amended Bidding Procedures that the Closing Date must take place no later than November 30, 2026, and that any change to this date must be with the consent of the Lender.

21. Instead, under the Extension Notice, the Auction would not occur until December 8, 2026—more than a week after the date by which the Successful Bidder must close.

22. In short, the Debtors purported to change the dates fixed by a court order unilaterally, without seeking an amended order, and in a manner designed to circumvent the Lender's consent right under the Amended Bidding Procedures Order. That is not permissible.

23. The deadlines in the Amended Bidding Procedures Order, therefore, remain the operative deadlines. The Bid Deadline has passed, no Qualified Bids (or any bids, for that matter) were received, and the Lender hereby gives notice of its intent to credit bid as permitted under Amended Bidding Procedures paragraphs J and L and section 363(k) of the Bankruptcy Code.

## LAW AND OBJECTION

### A. The Court Should Enforce the Amended Bidding Procedures Order as Written

24. The Bankruptcy Code "charges the bankruptcy court with carrying out its orders," *In re Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016), and bankruptcy courts retain inherent authority to do so. *Id.* (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)); *see also Weigel as Tr. of JNL/Forgione Distribution Tr. v. Barnard*, 661 B.R. 16, 22-23 (E.D.N.Y. 2021). In fact, the Bankruptcy Code specifically provides that "no provision . . . shall be construed to preclude the court from, *sua sponte*, taking any action . . . to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a); *see also Barnard*, 661 B.R. at 22-23 (citing to section 105(a) for the court's statutory powers in enforcing its own orders).

25. When the Bankruptcy Code, or any court order, makes action contingent on notice, hearing, consent, or further court approval, a party that acts without satisfying those conditions acts without authority, and the resulting action is ineffective, unenforceable, or void. *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384–85 (2d Cir. 1997) (holding that a debtor's cancellation of an estate insurance policy was ineffective where the transaction was outside the ordinary course and the debtor failed to provide the notice and hearing required by section 363(b)); *Newline Holdings, LLC v. Scott*, No. 21-cv-6346, 2022 WL 17251282, at *4–6 (N.D. Ill. Nov. 28, 2022) (affirming order voiding creditor's notice purporting to modify the automatic stay where the bankruptcy court interpreted its own agreed order and determined that the notice was ineffective).

26. The same principle applies in the sale-process context: parties may not privately modify, evade, or take unilateral action inconsistent with court-approved bidding procedures. *See generally In re Metaldyne Corp.*, 409 B.R. 661, 666–68 (Bankr. S.D.N.Y. 2009) (denying request

to preserve stalking-horse bid protections where the parties' private extensions never received court approval); *Super Stop Petroleum, Inc. v. Clark Retail Enters., Inc. (In re Clark Retail Enters., Inc.)*, 308 B.R. 869, 886–89 (Bankr. N.D. Ill. 2004) (holding that debtor and auction agent lacked authority under court-approved bidding procedures and purchase agreement to reallocate bid deposits where the governing documents did not expressly permit reallocation); *In re Bigler, LP*, 443 B.R. 101, 112–13 (Bankr. S.D. Tex. 2010) (holding that the bankruptcy court, not the parties, interprets bidding procedures and refusing to reopen bidding where the procedures clearly closed the auction).

**B. <u>The Extension Notice Is Ineffective Because the Lender Did Not Consent</u>**

27. The Debtors cannot do indirectly what the Amended Bidding Procedures forbid them to do directly. By moving the Bid Deadline and Auction Date past November 30, the Debtors necessarily purport to extend the Closing Date—without the Lender's consent that Paragraph P expressly requires. *See* Amended Bidding Procedures ¶ P. Nor does Paragraph K help the Debtors: it only permits adjournment of the Auction Date (not the Bid Deadline or other deadlines) after mere consultation, and cannot be used to accomplish what Paragraph P prohibits. Reading Paragraph K to allow the Debtors to push the Auction past the Closing Date would render the Lender's consent right in Paragraph P meaningless. The Extension Notice is therefore ineffective to alter the November 30 Closing Date, which remains in force.

28. The Extension Notice also presents a misleading picture. It states three times that the Debtors acted "after consultation with the Lender," suggesting a cooperative process, while omitting the dispositive fact that the Lender expressly did not agree to extend the sale timeline. *See* Extension Notice ¶¶ 3–5.

29. Not surprisingly, the Extension Notice says nothing about Paragraph P or the November 30 Closing Date (because it can't), even though the new Bid Deadline and Auction Date make that date impossible to meet. That silence is telling. The Debtors knew that any extension of the Closing Date required the Lender's consent, and they knew they did not have it. Consistent with past behavior, what they elected to do was an end-run around the Amended Bidding Procedures Order. Disregarding court orders is clearly not a permissible exercise of business judgment.

**C. <u>The Late-Emerging Bidders Do Not Justify Overriding the Lender's Rights</u>**

30. The late-emerging potential bidders do not justify overriding the Lender's consent right. At least one was introduced by Michael Cox, a former member of two of the Debtors with documented ties to their management and regulatory affairs, as well as purported counseling of Vanderbilt. This raises serious concerns about the independence of the process and the adequacy of disclosure. And on the current record, neither prospective bidder has shown an ability to complete diligence, address the outstanding regulatory issues under the Consent Order, and close by the November 30 Closing Date. There is also no explanation as to why neither of these parties participated in the sale process that has been conducted for the last five (5) months. This too should raise serious concerns. Indeed, this Court and parties-in-interest have been told numerous times that a white knight bidder is just around the corner, never to materialize.

31. The Debtors' pattern is now clear: each time the sale process reaches the point where the Lender is entitled to exercise its credit bid, the Debtors find a new reason to delay, while continuing to deplete the Lender's physical collateral as well as its cash collateral, while operating at a significant deficit, notwithstanding that a third-party is paying its legal fees and costs associated with the Long Island property. Each delay compounds the harm, and every blast is

irreversible. Seven months ago, the Court warned that the Debtors' arguments for continued use of the Lender's collateral had a shelf life. That shelf life has expired.

32. With no timely Qualified Bid from any third party, the Lender is the only Qualified Bidder under the Amended Bidding Procedures. The Lender will exercise its right to credit bid and take ownership of the Quarry, and the Debtors should be directed to close that transaction by the November 30, 2026 Closing Date.

## RESERVATION OF RIGHTS

The Lender reserves all rights, claims, and remedies, including, without limitation, the right to seek relief from the automatic stay, termination of the Debtors' authority to use cash collateral, adequate protection under section 363(e) of the Bankruptcy Code, conversion of these cases, and the right to supplement this Objection at or before any hearing on the Extension Notice.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Lender respectfully requests entry of an order (i) declaring the Extension Notice ineffective and of no force or effect; (ii) confirming that the November 30, 2026 Closing Date remains in effect absent the Lender's consent or further order of the Court; (iii) confirming that, no Qualified Bid having been submitted by the Bid Deadline, the Lender is the only Qualified Bidder and may proceed with its credit bid under the Amended Bidding Procedures and section 363(k) of the Bankruptcy Code; (iv) directing the Debtors to take all steps necessary to close the sale to the Lender on or before November 30, 2026; and (v) granting such other and further relief as is just and proper.

Dated: November 17, 2026

Respectfully submitted,

By: */s/ Katherine R. Catanese*

By: Katherine R. Catanese
Squire Patton Boggs (US) LLP
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
Telephone: (212) 872-9836
Email: katie.catanese@squirepb.com

Christopher J. Giaimo
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Email: christopher.giaimo@squirepb.com

*Attorneys for SpeyLo Holdings, LLC*